# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **TED KUDLINSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 18-2234-KHV** |
| | ) | |
| **UNIVERSAL UNDERWRITERS GROUP,** | ) | |
| **ZURICH AMERICAN INSURANCE COMPANY** | ) | |
| **And ZURICH HOLDING COMPANY OF** | ) | |
| **AMERICA, d/b/a ZURICH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On May 9, 2018, Ted Kudlinski filed suit against Universal Underwriters Group, Zurich American Insurance Company and Zurich Holding Company of America d/b/a Zurich.[1] Complaint (Doc. #1).   Plaintiff alleges that defendant discriminated and failed to make reasonable employment accommodations based on his disabilities, created a hostile work environment and retaliated against him.  He sues under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. § 44-1101, et seq. This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #66) filed August 9, 2019.  For reasons stated below, the Court sustains defendant's motion in part.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material

---

[1]     Plaintiff's complaint refers to a single defendant, "Zurich," but asserts that it includes various entities.  Complaint (Doc. #1) ¶ 2.

fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and he may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993). The heart of the inquiry is "whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251-52.

## Factual Background

The following facts are uncontroverted or, where controverted, viewed in the light most favorable to plaintiff.[2]

In April of 2000, plaintiff began working for defendant, a commercial property and casualty insurance company. Plaintiff's last position with defendant was a level 6T Claims Specialist. From June 4, 2011 until the end of plaintiff's employment, Team Manager Jim Miller supervised him and five other level 6T claims specialists. Miller's direct supervisor was Greg Bruning, an Assistant Vice President of Claims. Miller's team handled claims for employment practices liability, statute title error and omissions and customer complaint defense. None of defendant's other teams worked on these types of claims. Although plaintiff could receive claims based on complexity or because an insured requested him, he primarily received claims through defendant's rotation process.

Plaintiff's typical daily duties involved getting new claims files, reviewing petitions, reviewing policy coverage, assigning outside counsel, sending coverage letters, working mail, handling attorney requests and evaluating, settling and closing claims. Occasionally, plaintiff also attended mediations and trials. Defendant did not prepare a weekly work schedule for plaintiff. Accordingly, although defendant expected plaintiff to be in the office during "core hours," he had the flexibility to come and go.

---

[2]     Factual disputes about immaterial matters are irrelevant to a summary judgment determination. <u>Burkholder v. Gates Corp.</u>, No. 09-2322-KHV, 2011 WL 124537, at *2 n.1 (D. Kan. Jan. 14, 2011). Therefore, the Court omits immaterial facts and factual averments not properly supported by the record.

Defendant evaluated employee job performance twice a year in mid-year reviews and year-end assessments. Mid-year reviews discussed employee mid-year performance in relation to annual goals, but did not contain any type of performance ratings. By contrast, in year-end assessments, defendant gave each employee a performance rating on various objectives and an overall rating for performance throughout the whole year.

For adjusters, defendant's performance evaluations were partially based on adherence to a series of "best practices" for handling claims. Plaintiff, however, had an extensive workload. By the time Miller began supervising his team, plaintiff had over 360 pending claims files. Plaintiff understood that Miller expected him to adhere to about 160 best practices, but he thought this was unreasonable given his large caseload. While plaintiff believed that he followed the requirements as closely as possible under the circumstances, he expressed concern to Miller that given his caseload, it was impossible to adhere to them.

Defendant's performance evaluations were also based on several "objectives." These included the "Transactional Excellence" objective, which defendant scored based on two different kinds of audit reviews: a "Team Manager" audit review (which Miller completed), and a "Benchmark" audit review (which Quality Assurance completed) to determine whether particular files complied with best practices. A computer system randomly selected the files to be audited, although the auditor could reject the computer-selected file.

In March of 2012, Miller gave plaintiff his first year-end assessment. The rating, for 2011, gave plaintiff an overall rating of "3 – Fully meets expectations." For the Transactional Excellence, Litigation Management and Talent Management objectives, Miller rated plaintiff as "Partially meets expectations." Miller's overall comments stressed that plaintiff had a good understanding of the team's mission, but that his inventory had heavily impacted his work and

ability to meet quality standards. Miller made similar comments to his supervisor, Bruning, stating that plaintiff had issues meeting best practices and needed to make strong improvements in 2012. At the time of this assessment, plaintiff was not suffering from any type of disability, nor had he raised an issue about his medical condition.

On August 19, 2012, Miller placed defendant on a Performance Development Plan, which addressed improvement of overall file quality. This plan is reflected in Miller's own 2012 mid-year review, in which Bruning commented that plaintiff had not shown a willingness to get on top of his pending files, had struggled to meet best practices, and had hampered Miller's ability to even out workloads and new assignments. Miller's 2012 mid-year review discussed at least two other team members who were having performance issues, and each of them was on, or would be placed on, a performance plan. Plaintiff was not disabled at this time.

On February 14, 2013, for his 2012 year-end assessment, Miller gave plaintiff an overall rating of "2 – Partially meets expectations." Plaintiff received the same rating for the "Technical Excellence" and "Talent Management" objectives. Plaintiff admits that he deserved these ratings. At this time, plaintiff was not aware of any disabling medical condition.

On March 19, 2013, Jackie Grebitus from Claim Quality Assurance gave Bruning Benchmark review scores, which fell below expectations. After reviewing the scores, Bruning emailed Miller, stating that plaintiff's performance had dragged down the team scores, and instructing Miller to confer with Grebitus about how to improve plaintiff's scores. Miller did so, but expressed to Grebitus his disagreement with many of the scores that plaintiff received. Moreover, some of the problems that Grebitus identified also applied to other team members, and scores for the first six months of 2012 showed that plaintiff actually had higher scores than many other team members. Miller nonetheless told Bruning that they could discuss whether to initiate

disciplinary action toward plaintiff. On April 11, 2013, Miller met with plaintiff to discuss plaintiff's poor results from the Benchmark review.

On April 29, 2013, Miller emailed Mary Sean Ratzloff, a human resources consultant, and stated that by the end of 2012, plaintiff had improved in his development plan, and that Miller advised plaintiff that if he continued his current performance, he would again be performing at a level 3. Ratzloff responded that she had updated plaintiff's performance management status to reflect that no 2013 plan was necessary because he was currently meeting expectations. On July 19, 2013, plaintiff emailed a coworker explaining that he was having difficulty maintaining high quality given his large caseload, and that he often left the office with a significant amount of work that he was not able to complete. Moreover, plaintiff stated that to get up to date while maintaining good quality, it would take 60 to 70 hours per week, and he was not going to do that.

In August of 2013, Miller gave plaintiff his mid-year review, and commented that plaintiff had made quality improvements over last year but still needed to concentrate on certain areas. Miller did not place plaintiff on any performance development plan, however, at that time. In Miller's mid-year review, Bruning commented that the scores would have been very good except for plaintiff's performance, and that Miller had been working to address those issues. On November 20, 2013, Miller sent Bruning an email proposing to rate plaintiff as a "3" for 2013.

In late 2013, plaintiff began experiencing abdominal pain that progressively worsened. Initially, plaintiff thought that the cause might be a posture issue or his new desk chair, because he tended to slump when he worked. Plaintiff would get up from his desk to stretch and, in passing, tell Miller that he was having an odd pain in his abdomen that felt like a stretched or pulled muscle. Plaintiff told Miller that the pain was worsening, but that it might be the result of the new chair. Miller gave him the name of a person in facilities management to assist with the chair.

After a few weeks, plaintiff concluded that the chair was not causing his pain. Miller would occasionally see plaintiff standing and stretching, and plaintiff would comment about a "weird" pain and ask whether Miller had ever experienced anything similar. Around January of 2014, plaintiff told Miller that he was concerned, and that although he initially thought it might be his appendix, he had ruled that out. Plaintiff stated that it could be a posture issue, but that if it did not improve, he would have to go see a doctor. He also told Miller that it was becoming difficult to work the hours necessary to do the job because only his recliner at home relieved his pain. Miller told plaintiff that he could go to the doctor. Plaintiff responded that he was going to try to work it out. Plaintiff also commented that it was difficult to put in extra time, to which Miller responded, "[Y]ou've got to do what you've go to do." Pl.'s Dep. (Vol. I) (Doc. #67-2) at 121:1-121:23.

On January 14, 2014, Thomas Lysaught, Bruning's supervisor, sent Bruning an email about Benchmark results from 2013. Lysaught stressed group and regional struggles and directed "robust, meaningful, action-oriented plans" to effectively address key areas "with the necessary focus, passion and sense of urgency." Decl. of Greg Bruning (Doc. #67-10) at ¶ 11. The same day, Bruning forwarded Lysaught's email to Miller, and asked Miller to review his team score and let Bruning know who or what was dragging it down. In response, Miller identified multiple team members who were negatively impacting the team score, including plaintiff. Miller noted that plaintiff's impact on the team was minimal, however, and that other members hurt the team's score more. At this time, Miller and Bruning began communicating about placing plaintiff on some form of corrective action.

On January 20, 2014, Miller emailed Ratzloff, stating that he had an employee who would be rated a "2" for the second year in a row. Although they thought that plaintiff was doing better

at beginning of 2013, they concluded that his quality had not improved, and as a result, they planned to put plaintiff on probation when they gave him his year-end performance review. On January 23, 2014, Miller and Ratzloff discussed plaintiff's performance issues and Miller's desire to place him on corrective action. The next step would be Miller placing plaintiff on a written warning for 60 days. If plaintiff did not improve after that, Miller would place him on a performance improvement plan. Following their discussion, Ratzloff emailed Miller a written warning template to help draft plaintiff's warning.

Plaintiff's abdominal pain was progressively worsening, and on the morning of Saturday, February 8, 2014, he woke up with intense pain and went to the emergency room. There, he complained of right lower quad abdominal pain that started a month earlier and worsened over the last six days. Plaintiff had flagged his new work chair as the potential cause. Plaintiff's CT scan, however, suggested an omental infarction[3] and a right kidney lesion suspicious for malignancy. The doctors instructed plaintiff to arrange a follow-up appointment with a urologist in three to five days or immediately if his symptoms worsened. Plaintiff received a work release form that instructed him not work from February 8 to 14, 2014, but did not contain other work restrictions. That day, plaintiff told Miller that he would not be at work for a week because the doctors had diagnosed him with an omental infraction and a kidney tumor that he believed was cancerous. Plaintiff stated that treatment for omental infarction included rest and oxycodone, and that he should be able to return to work in approximately a week. Miller told plaintiff to keep him posted.

During the week while plaintiff was off work, on February 11, 2014, Miller and Ratzloff

---

[3]      The parties do not explain what an omental infarction is. It appears, however, that it is a condition that causes sudden, severe abdominal pain that can mimic acute appendicitis. Steve Lindley and Paul Peyser, <u>Idiopathic Omental Infarction: One For Conservative Or Surgical Management?</u>, J. Surgical Case Rep., Vol. 2018, Issue 3 (March 2018).

discussed the fact that Miller had plaintiff's year-end assessment and written warning ready for delivery, but that plaintiff had gone to the emergency room and was hoping to return the following Monday. The next day, February 12, 2014, plaintiff emailed Miller to repeat that he was seeing a surgeon that afternoon.

In February of 2014, on Miller's 2013 year-end assessment, Bruning made several negative comments about plaintiff's performance. Bruning stated that certain scores would have been good except for plaintiff, and that Miller would have to deal with plaintiff's poor performance. He added that if plaintiff did not improve, Miller would need to take the necessary steps to address the situation.

On February 17, 2014, plaintiff returned to work and gave Miller his work release form. That afternoon, Miller gave him his 2013 year-end assessment, which scored plaintiff as a "2 – Partially meets expectations." Miller then gave plaintiff the written warning. The written warning discussed plaintiff's prior performance issues, the issues raised in the 2013 year-end assessment and the expectations for improvement. The warning also specified a 60-day period during which defendant would closely monitor plaintiff. In response to plaintiff's inquiry, Miller included a handwritten note at the end of the warning, stating that during this written warning period, plaintiff may have to have medical care that required him to miss several days of work. The note added that if plaintiff took time off for medical care, defendant would extend the written warning period for the same number of days that plaintiff missed for medical care.

During their discussion on February 17, plaintiff said that he could get back to where he needed to be. In response, Miller indicated that plaintiff "was not going to survive this one." Pl.'s Dep. (Vol. I) (Doc. #67-2) at 157:5-159:6. Miller also indicated that he was waiting to hear from human resources, and that at the end of the 60-day warning period, defendant would offer plaintiff

a two-month severance or terminate his employment.

During their discussion on February 17, plaintiff requested that Miller not assign him new claims for two weeks, to allow him to catch up. Miller denied the request. The following day, plaintiff asked Miller to reconsider the request, and again asked Miller to take him out of the new claims rotation for two weeks. A few days later, plaintiff and Miller met to discuss plaintiff's request. Miller told plaintiff that he had sent the request to Ratzloff, and that she would contact plaintiff. During this discussion, plaintiff told Miller that he was still having abdominal pain and that he could only work eight hours a day. Plaintiff added that although he could work through it, he intended to go home after eight hours to stretch out on his recliner to prevent further omental infarctions.

On February 21, 2014, plaintiff and Ratzloff discussed plaintiff's request to be taken out of the new claims rotation for two weeks. Ratzloff said that she would get back to him with an answer. Plaintiff later amended his request, and asked that defendant take him out of the new claims rotation for three weeks because more claims had piled up while they were considering his request. The same day, Miller sent Ratzloff an email stating that plaintiff's requested accommodation was based upon work required for his position, and questioned whether the request should even be considered an accommodation.

On February 28, 2014, Miller again emailed Ratzloff to discuss plaintiff's request. Miller stated that he told plaintiff that he would not give him new assignments for three days, but that plaintiff had again requested three weeks because more claims had piled up. Miller noted that plaintiff wanted a decision in writing, and that he would be having more medical appointments and surgery in the future.

On March 6, 2014, Ratzloff sent plaintiff an email granting his request for a two-week

relief from new claims. The email noted that although handling new claims was an essential function of his job, defendant was accommodating his request as a good faith gesture. Ratzloff ended her email by stating that defendant might not be able to accommodate further requests to be kept out of the new claim rotation. Plaintiff acknowledges that it is "pretty much an obvious statement" that receiving new claim assignments was an essential function of his job. Id. at 183:20-184:23. Plaintiff contends that Miller was not happy about plaintiff working eight-hour days, and told plaintiff that he would not change claims assignments. Plaintiff responded that he was not asking for a change in assignments.

On March 10, 2014, plaintiff obtained a note from his primary care physician. It stated that for the next two weeks, plaintiff could not work more than eight hours a day or 40 hours a week. The note also stated that the physician would re-evaluate plaintiff in two weeks if his physical symptoms did not improve. Plaintiff gave the note to Miller, and they did not further discuss plaintiff's work hours.

On March 14, 2014, Miller sent Ratzloff an email stating that as of that day, it had been two weeks since plaintiff received any new claims. The email stated that Miller had been reviewing plaintiff's files and was not seeing the improvement for which they had hoped. Miller also noted that he and Bruning would review a large number of plaintiff's files the following week. On March 18, 2014, Miller emailed Ratzloff about the review of 34 of plaintiff's files. The email stated that the results did not show the progress that they would have expected for plaintiff to meet defendant's best practices.

On March 27, 2014, plaintiff obtained another note from his primary care physician. It stated that he would be having surgery on May 6, 2014, and that until the surgery, he could not work more than eight hours a day or 40 hours a week. The same day, plaintiff made a note in his

iPhone that Miller had conveyed to him that the 60-day warning period would not expire on April 17, and that Miller was waiting to hear back from human resources. The note stated, "Meeting the other day, [Miller] now states D day not 4-17-14. Asked what changed, stated nothing, that warning only on 2-17-14. I pointed out that is not correct, he said we would meet in March if no progress, then 2 mo severance for a resignation. Or may be terminated. Stated that he'd have to get back to me." Pl.'s iPhone Notes Mar. 27, 2014 (Doc. #67-42).

On April 25, 2014, plaintiff had an MRI of the mass on his kidney. Compared with previous scans, the image revealed that the cyst had not grown or changed in size or nature. In progress notes, plaintiff's urologist stated that although observation might be the best option, plaintiff wanted the mass removed because his family had a history of aggressive cancers.

On May 8, 2014, Miller extended plaintiff's written warning for continued unsatisfactory performance and failure to meet the quality requirements of his position. Plaintiff believed that Miller would get authority from human resources to "pull the trigger" after plaintiff came back from medical leave. Pl.'s Dep. (Vol. I) (Doc. #67-2) at 203:5-204:24. On June 4, 2014, Miller emailed Ratzloff to inform her that he and plaintiff met for the last time before plaintiff's surgical leave. In this meeting, plaintiff and Miller went over plaintiff's recent scores, which fell below expectations. Miller told plaintiff that he would continue to review plaintiff's files, and that they would discuss his progress when he returned from leave in four to six weeks.

On July 8, 2014, Miller asked another member of his team (Palmer) to delay scheduled time off until plaintiff returned from surgery. On June 10, 2014, plaintiff had surgery for the mass on his kidney, which the doctors diagnosed as clear cell renal carcinoma. Since the surgery, plaintiff has been cancer-free. On August 8, 2014, plaintiff's doctor released him to return to work on August 11, 2014, with no restrictions. While on leave, plaintiff did not receive new claim files

and other team members covered customer needs on his existing files.

On August 11, 2014, plaintiff returned to work. Miller immediately asked plaintiff whether he had been interviewing for jobs while he was gone. Later that day, plaintiff met with Miller, who indicated that plaintiff still had a lot of overdue tasks, and that he was waiting for human resources to approve the offer of a two-month severance and a separation agreement. Plaintiff then asked Miller, "Why don't you just fire me?" Id. at 211:19-213.5.

During plaintiff's leave of approximately two months, defendant did not assign him any new claim files. Therefore, during their discussion on August 11, plaintiff asked Miller how long he would keep him off new claims. Miller began assigning plaintiff new claims the following day. At that point, plaintiff believed that defendant was going to discharge him. In a telephone conversation on August 12, 2014, plaintiff told Ratzloff that he had conveyed to Miller that he was far behind and that there was no way he could get caught up in 60 days, but that he was not resigning.

On August 14, 2014, plaintiff told Ratzloff that Miller had previously made inappropriate comments about people's age, disability, sexual orientation and religious affiliation. Ratzloff reported plaintiff's concerns to Andrew Atkinson, Assistant Vice President of Employee Relations. The same day, plaintiff raised many of the same concerns in a phone conversation with Atkinson. At the end of the discussion, Atkinson told plaintiff that he would investigate the concerns, that he took them seriously and that he would follow up with plaintiff soon. In a subsequent investigation, one team member told Atkinson that Miller yelled at plaintiff for complaining about his workload.

Miller met with plaintiff to give him his 2014 mid-year review. Miller commented that plaintiff's Benchmark scores for two audited files were very good, but that the Team Manager audit reviews continued to be below expectations. Later, plaintiff asked Ratzloff to assign him to

a different manager because Miller was openly criticizing him on his files in front of his coworkers and continually insinuating that he would be discharged. Ratzloff denied this request.

On August 26, 2014, Miller sent a message to Ratzloff stating that plaintiff's scores were low in 2012, improved in 2013 and dropped below goals again in 2014. On the same day, however, Miller sent Ratzloff emails questioning whether plaintiff's low scores were accurate. Miller's emails state that he had no idea where he got plaintiff's Benchmark numbers, and that after reviewing a large number of his files over the prior six months, plaintiff's scores were very good for the reviewed files.

On August 27, 2014, Ratzloff told plaintiff that he could go home, and to take off the following day. This was ultimately plaintiff's last day at work. Later on August 27, Atkinson emailed plaintiff about his accusations concerning Miller. Atkinson stated that although he had insufficient evidence to conclude that Miller had violated defendant's policy, he did have some evidence to substantiate a couple of Miller's comments during team meetings. Atkinson stated that he had spoken to Bruning and Miller regarding the findings, and that defendant would take appropriate action to address them.

On August 28, 2014, plaintiff again told Ratzloff that he would not work for Miller, but that he was ready, willing and able to report to a different manager. Ratzloff told plaintiff that defendant expected plaintiff to come in to work and do his job.

Also on August 28, Ratzloff had a phone conversation with Miller. Her notes from the conversation state that plaintiff had brought up possible medical issues that were impeding his ability to accomplish tasks, and that he had put them on notice that he may need accommodations. The notes also state that she was going to tell plaintiff that he and management have different views of his performance, and that she needed time to investigate why their views were different.

According to the notes, "This will help us defend any ADA issues that may come up in a charge." Ratzloff Call Aug. 28, 2014 (Doc. #74-16). Specifically, "The issue right now is evaluating the risks of taking the next step I am not saying that there was disparate treatment." Id. According to Ratzloff, "when we looked into the Benchmark and TM audit information, we had some concerns about other non-disabled employees who scored lower than [plaintiff] but only [plaintiff] was placed on corrective action." Id. Ratzloff indicated that this "is an issue that we will need to look into further before making a determination of next steps," but that she did "not want to get into that right now. Would like to have that conversation be under privilege." Id. Further, the notes state, "If [plaintiff] quits, then I'm going to request that he send me an email to that effect. I can then show that I've tried to address the issue but need the time to review." Id. However, "If he doesn't resign, I will set up some time tomorrow for us to discuss." Id.

On August 29, 2014, plaintiff asked Ratzloff if she could just end his employment based on their discussions. Plaintiff clarified that he was not resigning, to which Ratzloff responded that she understood. Ratzloff insisted, however, that defendant needed a written confirmation that plaintiff had decided to end his employment.

On September 4, 2014, Ratzloff emailed plaintiff, stating that she was "writing to confirm our conversations of August 28 and 29, 2014." Ratzloff Email Sept. 4, 2014 (Doc. #67-67). The email stated that "[w]e accept your decision to end your employment with [defendant]. This confirms that your last day of work was August 27, 2014 and your last day of employment was September 2, 2014." Id. On September 12, 2014, plaintiff responded to Ratzloff's email, again clarifying that he was not resigning. Plaintiff insisted that he did not quit or resign, but that defendant had fired him.

On February 20, 2015, plaintiff filed charges of discrimination with the Kansas Human

Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC"). On May 9, 2018, plaintiff sued, alleging that defendant failed to make reasonable accommodations in violation of the ADA (Count 1), discriminated and created a hostile work environment in violation of the ADA (Count 2), retaliated in violation of the ADA (Count 3) and discriminated and retaliated in violation of the ADEA and the KADEA (Count 4).

<u>**Analysis**</u>

On August 9, 2019, defendant filed its <u>Motion For Summary Judgment</u> (Doc. #66) seeking summary judgment on all of plaintiff's claims. Specifically, defendant asserts that it is entitled to summary judgment on some of plaintiff's allegations because he did not timely exhaust administrative remedies. Defendant also seeks summary judgment on Count 1, because as a matter of law, it did not fail to accommodate plaintiff's alleged disability in violation of the ADA; on Count 2, because as a matter of law, it did not discriminate against plaintiff in violation of the ADA; and on Count 3, because as a matter of law, it did not retaliate against plaintiff in violation of the ADA.[4]

**I.      Exhaustion Of Administrative Remedies (Counts 1-3)**

Defendant asserts that it is entitled to summary judgment on some of plaintiff's allegations because he did not timely exhaust administrative remedies. Under Title I of the ADA, plaintiff must exhaust administrative remedies before filing suit. <u>Jones v. U.P.S., Inc.</u>, 502 F.3d 1176, 1183 (10th Cir. 2007). To exhaust administrative remedies, plaintiff must first file a charge with the EEOC. <u>Id.</u> Accordingly, plaintiff generally may not sue under the ADA "based upon claims that

---

[4]      In <u>Plaintiff's Response To Defendant's Motion For Summary Judgment</u> (Doc. #74) filed September 10, 2019 at 111, plaintiff withdraws his age discrimination claims under the ADEA and KADEA, and concedes that summary judgment is appropriate on Count 4. Accordingly, the Court grants defendant summary judgment on Count 4.

were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue letter." White v. CertainTeed Corp., No. 17-2262-DDC-KGG, 2019 WL 2085671, at *10 (D. Kan. May 13, 2019) (quoting Foster v. Ruhrpumpen, 365 F.3d 1191, 1194 (10th Cir. 2004)).  To be timely, the ADA required plaintiff to file his charge with the EEOC within 300 days of the alleged unlawful employment action.[5]  Schmidt v. GPI-KS-SB, LLC, No. 13-2381-KHV, 2014 WL 5431157, at *4 n.13 (D. Kan. Oct. 27, 2014).

Under the ADA, each discrete incident of discrimination constitutes its own "unlawful employment action." White, 2019 WL 2085671, at *10 (citing Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003)).  Accordingly, plaintiff must file an EEOC charge for each discrete incident of discrimination within 300 days in order to preserve his claim based on that incident.  Id.  Discrete incidents of discrimination include "termination, failure to promote, denial of transfer, or refusal to hire."  Id.  They also include an employer's rejection of an employee's proposed accommodation.  See Miller v. Dillon Companies, Inc., No. 15-4946-DDC, 2016 WL 2894696, at *7 (D. Kan. May 18, 2016); see also Becerra v. EarthLink, Inc., 421 F. Supp. 2d 1335, 1343 (D. Kan. 2006) (citing Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134-35 (2d Cir. 2003) and Cherosky v. Henderson, 330 F.3d 1243, 1248 (9th Cir. 2003)).  Accordingly, to preserve his claim based on an employer's rejection of an accommodation, plaintiff must have filed a charge of discrimination within 300 days of the rejection.  Becerra, 421 F. Supp. 2d at 1343.

Here, plaintiff filed his discrimination charge on February 20, 2015.  Therefore, the ADA bars any claims based on discrete incidents that occurred before April 26, 2014.  As explained

---

[5]     In states where a state agency has authority to investigate employment discrimination ("deferral states"), the ADA requires claimants to file a charge of discrimination within 300 days of the alleged unlawful employment practice.  Schmidt, 2014 WL 5431157, at *4 n.13 (citing Davidson v. Am. Online, Inc., 337 F.3d 1179, 1183 n.1 (10th Cir. 2003)).  Kansas is a deferral state.

below, this eliminates several of plaintiff's failure-to-accommodate and discrimination claims (Counts 1 and 2).

## II.      Failure To Accommodate (Count 1)

Plaintiff claims that defendant rejected repeated requests for reasonable accommodations in violation of the ADA. Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To assess a failure-to-accommodate claim, the Court applies a modified burden-shifting analysis. Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017). Under this analysis, plaintiff must first establish a prima facie case by showing (1) he is disabled under the ADA, (2) he is a qualified individual under the ADA and (3) he requested a plausibly reasonable accommodation and defendant failed to reasonably accommodate him. Id. (quoting Sanchez v. Vilsack, 695 F.3d 1174, 1177 (10th Cir. 2012)). Next, the burden shifts to defendant to either rebut the prima facie case or establish an affirmative defense. Id. Plaintiff must then rehabilitate his prima facie case or establish a genuine dispute regarding any affirmative defense. Id.

Here, defendant asserts that plaintiff has not established a prima case because (1) some of his conditions do not qualify as "disabilities" under the ADA and (2) as a matter of law, defendant did not deny requests for reasonable accommodations.

### A.      Disability Under The ADA

Defendant asserts that some of plaintiff's conditions are not "disabilities" under the ADA. A person is disabled under the ADA if he has "a physical or mental impairment that substantially

limits one or more major life activities." Crowell v. Denver Health & Hosp. Auth., 572 F. App'x 650, 657 (10th Cir. 2014) (quoting 42 U.S.C. § 12102(1)(A)). An impairment is substantially limiting if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities" include performing manual tasks, walking, standing and working. 42 U.S.C. § 12102(2)(A); see Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1143 (10th Cir. 2011) (Tenth Circuit has repeatedly recognized working as major life activity). While the existence of an impairment and a major life activity are questions of law for the Court, "whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury." Carter, 662 F.3d at 1143. "Substantially limits" is not meant to be a demanding standard, and "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A); see Crowell, 572 F. App'x at 658.

Here, plaintiff asserts that several of his conditions constitute "disabilities" under the ADA: his kidney cancer, omental infarction and related chronic pain.[6] Defendant only contests the allegation of omental infarction. According to defendant, plaintiff's omental infarction was not substantially limiting because it lasted only eight weeks, and after treatment consisting of rest, pain medication and antibiotics, plaintiff's doctors cleared him to work without restrictions. In other words, defendant does not dispute that the omental infarction is an "impairment," or that working is a "major life activity," but only that this particular impairment was not substantially limiting.

---

[6] In Plaintiff's Response (Doc. #74) at 89, plaintiff for the first time identifies "partial nephrectomy" as one of his disabilities. This allegation does not appear in the complaint or in the pretrial order. Therefore, the Court disregards the allegation. See Shaub v. Newton Wall Co/UCAC, 153 F. App'x 461, 464 (10th Cir. 2005) (pretrial order controls).

Viewed in light most favorable to plaintiff, the evidence creates a genuine issue of material fact whether omental infarction substantially limited a major life activity of plaintiff. In August of 2013, plaintiff began experiencing abdominal pain that continued to worsen over several months. This pain caused plaintiff to get up from his desk to stretch, and he told Miller that it felt like he had stretched or pulled a muscle. In January of 2014, plaintiff also informed Miller that he was in a lot of pain, and that he had to leave work because only his recliner at home relieved it. On February 8, 2014, plaintiff's pain caused him to go to the emergency room, where the doctors diagnosed the omental infarction along with a kidney lesion. Doctor's prescribed pain killers, and instructed plaintiff not to work the following week. His abdominal pain continued, however, which forced him to return to the doctor on March 10, 2014. The doctor again limited plaintiff's working hours. This evidence creates a genuine issue of material fact whether plaintiff's omental infarction substantially limited a major life activity, including working, standing and performing manual tasks. Accordingly, the evidence of plaintiff's omental infarction is sufficient to defeat defendant's summary judgment motion on this issue.

**B.  Reasonable Accommodation**

Defendant asserts that it did not deny requests for reasonable accommodations for plaintiff's disabilities. Punt, 862 F.3d at 1050. Under the ADA, plaintiff must show that he requested a plausibly reasonable accommodation and defendant failed to reasonably accommodate him. Id. A reasonable accommodation may include job restructuring, part-time or modified work schedules, reassignment to a vacant position and appropriate adjustment or modifications of examinations, training materials or policies. 42 U.S.C. § 12111(9)(B).

Here, plaintiff alleges that defendant denied several of his specific requests for reasonable accommodations[7]: (1) in late 2013, a request for a new chair; (2) on February 8, 2014, a request to take a week off from work; (3) on February 17, 2014, a request that defendant remove him from the new claims rotation for two weeks; (4) on February 18, 2014, a request that defendant remove him from the new claims rotation for two weeks (later amended to three weeks); (5) on March 10, 2014, a request to work no more than eight hours a day and 40 hours a week; (6) on March 27, 2014, a request to work no more than eight hours a day and 40 hours a week; (7) on March 27, 2014, a request for time off for kidney surgery on May 27 and recovery, which ultimately amounted to approximately two months; (8) on August 11, 2014, a request that defendant temporarily remove him from the new claims rotation; (9) in late August of 2014, multiple requests for a different manager; (10) "time off for medical appointments" and (11) "redistribution of caseloads."  Plaintiff's Response (Doc. #74) at 93-94.

### 1.    Requests 1, 2, 5, 6, 7, 10 and 11

Before determining whether any of plaintiff's accommodation requests were reasonable under the ADA, the Court must eliminate several of them for other reasons.  First, the undisputed facts show that defendant actually accommodated several of the requests.  For example, plaintiff does not claim that defendant denied his request for a new chair in 2013 (Request 1).  In fact, upon inquiry from plaintiff, Miller gave him contact information for facilities management to assist with a new chair.  Plaintiff later concluded that the chair was not causing the pain, and he makes no further allegations about it.

---

[7]    In listing these requests, plaintiff does not identify when most of them occurred, and he conflates many of the requests.  The Court uses the undisputed facts to fill plaintiff's omissions.

The same is true for Requests 2, 5, 6, 7, 10 and 11. When plaintiff requested a week off on February 8, 2014, following his emergency room visit (Request 2), Miller told plaintiff to keep him posted, and plaintiff took the week off. Likewise, defendant did not reject plaintiff's request on March 27, 2014, for time off for kidney surgery and recovery (Request 7). Accordingly, plaintiff took approximately two months off from work following the surgery. The same applies to plaintiff's vague assertion that he "requested time off for medical appointments" (Request 10) – no evidence suggests that defendant ever rejected requests for medical leave, or punished plaintiff when he returned. Plaintiff apparently concedes this point, arguing that defendant did nothing for him "other than permitting him to take time off." Id. at 97.

Similarly, on March 10, 2014, when plaintiff asked to work no more than eight hours a day and 40 hours a week (Request 5), he gave Miller a physician's note, and the two did not further discuss it. Defendant likewise did not object when plaintiff made the identical request on March 27, 2014 (Request 6). Indeed, the facts show that defendant hardly ever imposed particular work hour requirements; it expected plaintiff to work the hours necessary to complete his case files in accordance with best practices. Defendant did not prepare a weekly work schedule for plaintiff, and although it had certain "core hours" when it expected plaintiff to be in the office, plaintiff otherwise had the flexibility to come and go. In other words, because defendant did not require plaintiff to work longer than eight hours, it did not need to reject any request not to do so.[8] Finally,

---

[8] Plaintiff could argue that even if defendant did not *require* him to work more than eight hours a day, his eight-hour restriction left him unable to complete his work. Under such a theory, however, plaintiff is not a "qualified individual" under the ADA. The ADA defines "qualified individual" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). In other words, plaintiff is not a "qualified individual" if he cannot perform the essential functions of his position even with the requested accommodation. Plaintiff concedes that managing his claims is an essential function of his job. Plaintiff's Response (Doc. #74) at 96. Accordingly, if plaintiff argued
(continued. . . .)

while plaintiff alleges that on multiple occasions, he requested that defendant not assign him *new* claims, which the Court addresses below, the record contains no evidence showing that plaintiff ever requested a "redistribution of caseloads." (Request 11).[9]  Accordingly, in these respects, plaintiff has not raised a genuine issue of material fact whether defendant failed to accommodate his requests.  Therefore, defendant is entitled to summary judgment with respect to Requests 1, 2, 5, 6, 7, 10 and 11.

### 2. Requests 3 and 4

Plaintiff did not exhaust administrative remedies with respect to events which occurred before April 26, 2014.  As a result, the ADA bars plaintiff from pursuing claims with respect to Requests 3 and 4.  On February 17, 2014, Miller rejected plaintiff's request that defendant remove him from the new claims rotation for two weeks (Request 3).  Because this rejection occurred prior to April 26, 2014, the ADA bars any claim based on this incident.  The same is true for any claim based on plaintiff's renewed request on February 18, 2014, which he ultimately amended to include a three-week relief from new claims (Request 4).  On March 6, 2014, Ratzloff granted the original request for two weeks.  Even assuming that Ratzloff's response constitutes a rejection of plaintiff's amended request, the rejection occurred prior to April 26, 2014.  Accordingly, the ADA

---

[8](. . . .continued)
that he could not manage his claims even with the requested eight-hour restriction, he would not be a qualified individual under the ADA.

[9]    Plaintiff does not clarify the difference between his "redistribution of caseloads" request and his requests that defendant temporarily remove him from the new claims rotation.   To the extent that plaintiff argues that other team members should have managed his *existing* claims, he does not identify incidents or provide dates when he requested such an accommodation.  Moreover, such an accommodation would be unreasonable as a matter of law, as plaintiff concedes that managing existing claims is an essential function of his job.  Plaintiff's Response (Doc. #74) at 96.

likewise bars any claim based on this incident. Defendant is entitled to summary judgment on these Requests.

### 3. Requests 8 and 9

The Court must determine whether the two remaining allegations – Requests 8 and 9 – constitute requests for reasonable accommodations. Beginning with Request 9, plaintiff appears to assert that reporting to a different supervisor was a reasonable accommodation which he requested on multiple occasions in late August of 2014.

Under the ADA, reasonable accommodations include taking "reasonable steps to reassign a qualified individual to a vacant position or a position the employer reasonably anticipates will become vacant in the fairly immediate future." Albert v. Smith's Food & Drug Centers, Inc., 356 F.3d 1242, 1252 (10th Cir. 2004) (citing Smith v. Midland Brake, Inc., 180 F.3d 1154, 1159 (10th Cir. 1999)(en banc)). At the time of the summary judgment proceeding, however, "plaintiff must specifically identify vacant jobs which were available at or about the time [he] requested reassignment." Anderson v. United Parcel Serv., Inc., No. 09-2526-KHV, 2011 WL 4048795, at *12 (D. Kan. Sept. 13, 2011). Moreover, courts have repeatedly held that requests to be transferred to a different supervisor "go beyond reasonable accommodation." Snyder-Gibson v. Cessna Aircraft Co., No. 06-1177-JTM, 2007 WL 2155666, at *1 (D. Kan. July 26, 2007) (dismissing reasonable accommodation allegations that employer should have transferred employee to another supervisor).

Here, plaintiff cites no supporting authority. And while he vaguely asserts that Miller was "an unqualified manager who was biased against employees with health conditions and had no training in order to recognize and/or address such issues," Plaintiff's Response (Doc. #74) at 97,

this argument does not create a genuine issue of material fact whether defendant failed to accommodate his ADA disabilities by reassigning him to a different supervisor.

Request 8 is that on August 11, 2014, plaintiff asked defendant to temporarily remove him from the new claims rotation.[10]  To defeat an employer's motion for summary judgment, "the employee must first demonstrate that an accommodation appears reasonable on its face."  Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1122 (10th Cir. 2004).  An accommodation request is unreasonable as a matter of law when the employee seeks "to be relieved from an essential function of [his] position."  Punt, 862 F.3d at 1051.  The term "essential function" means "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).  To determine whether a job function is essential, the Court considers (1) the employer's judgment as to which functions are essential, (2) written job descriptions, (3) the time spent performing the particular function, (4) the consequences if the individual cannot perform the function, (5) any collective-bargaining agreement,[11] (6) the work experience of those in the position in the past and (7) the current work experience of those in similar positions.  Adair v. City of Muskogee, 823 F.3d 1297, 1307 (10th Cir. 2016).

Here, these factors combine to show that as a matter of law, receiving new claims was an essential function of plaintiff's job.

---

[10]     The undisputed facts do not show that plaintiff explicitly asked defendant to remove him from the new claims rotation.  Instead, plaintiff was not receiving new claims at the time, and he merely asked Miller how long that situation would last.  The record contains no evidence that plaintiff explicitly asked to remain out of the rotation or for how long.  Even construing plaintiff's question as a request for an accommodation, however, the accommodation would be unreasonable as a matter of law, as explained below.

[11]     The parties do not identify any relevant collective-bargaining agreement.  Thus, the Court does not apply this factor.

i.      Judgment Of Employer

Under the first factor, the Court considers the employer's judgment as to which functions are essential.  Id. The Tenth Circuit defers to an employer's judgment because the essential-function inquiry "is not intended to second guess the employer or to require the employer to lower company standards."  Id.  Accordingly, although the employer's judgment is not conclusive evidence, the Court "still weigh[s] *heavily* the employer's judgment regarding whether a job function is essential."  Id. (emphasis in original).

Here, defendant states that receiving new claims is an essential function of plaintiff's position because the "very purpose for [his] job to exist was to adjust claims filed by [defendant's] insureds."  Defendant's Motion For Summary Judgment (Doc. #67) at 48.  Initially, plaintiff agreed that receiving new claim assignments was an essential function of his job, testifying that this is "pretty much an obvious statement."  Pl.'s Dep. (Vol. I) (Doc. #67-2) at 183:20-184:23.  Now, at the summary judgment stage, plaintiff has changed his mind.[12]  While he still agrees that adjusting claims is an essential function of his job, plaintiff now makes the subtle argument that adjusting *new* claims is not.  Plaintiff's Response (Doc. #74) at 96.  Plaintiff's hair-splitting between "adjusting claims" and "adjusting new claims" does not create a genuine issue of material fact whether receiving new claims was an essential function of his job – or whether defendant's considered judgment was that it was.  This is especially true in light of plaintiff's well-taken

---

[12]      Without further explanation, plaintiff also insists that "[a] number of the functions of [p]laintiff's job were not essential," including paying invoices, printing and stuffing envelopes, copying documents, printing letters and documents, data entry [and] making phone calls to gather basic information."  Id. at 97.  Plaintiff's digression into all of the "administrative, non-essential functions" of his job distracts from the relevant issue: whether receiving new claims is an essential function of his position.

concession on that point. <u>See</u> <u>Pl.'s Dep. (Vol. I)</u> (Doc. #67-2) at 183:20-184:23. This factor strongly suggests that receiving new claims was an essential job function.

ii.     <u>Written Job Descriptions</u>

Under the second factor, the Court examines written job descriptions. <u>Adair</u>, 823 F.3d at 1307. Here again, plaintiff makes the distinction that although his job description includes handling claims, it does not explicitly include handling *new* claims. This argument might make sense if defendant had hired plaintiff for a temporary position to resolve existing claims, in which case, plaintiff's employment would have been self-limited by existing caseloads as of April of 2000, when he began work for defendant. Nothing in the record supports such a theory of the case. Plaintiff's job profile repeatedly emphasizes the obligation of claims specialists to manage claims received from insureds in accordance with defendant's rules. Plaintiff's written job description requires him to "[r]esolve[] claims according to Best Practices and within authority limits," and "[w]ork to have timely resolution to claims by developing case strategy." <u>Job Profile</u> (Doc. #67-11) at 1-2. Defendant had claims specialists resolve these claims pursuant to a claims rotation process. Accordingly, although it does not explicitly clarify *how he receives* the claims, plaintiff's job description does emphasize his obligation to manage the claims pursuant to defendant's practices.

iii.     <u>Time Spent Performing The Function</u>

Under the third factor, the Court examines the time spent performing the particular function. <u>Adair</u>, 823 F.3d at 1307. Plaintiff testified that his *daily* duties included receiving and reviewing new claims. This factor suggests that receiving new claims was an essential job function.

iv.     Consequences If Employee Cannot Perform The Function

Under the fourth factor, the Court examines the consequences if the individual cannot perform the function.  Adair, 823 F.3d at 1307.  The ADA does not require an employer "to reallocate job duties in order to change the essential function of a job."  Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995).  Accordingly, an "accommodation that would result in other employees having to work[] harder or longer hours is not required."  Id.; see Rehrs v. Iams Co., 486 F.3d 353, 357 (8th Cir. 2007) ( "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated") (quoting Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1094 (5th Cir. 1996))); see also Peters v. City of Mauston, 311 F.3d 835, 845 (7th Cir. 2002) (finding "unreasonable" accommodation that would "require another person to perform an essential function" of disabled employee's job).

The undisputed facts show that if defendant did not assign new claims to plaintiff, it would have to distribute them to other adjusters on plaintiff's team.  Plaintiff's team members would have to complete plaintiff's new claims along with their own, thus increasing their work.  This factor suggests that receiving new claims was an essential job function.[13]  See McIntyre v. Washington Metro. Area Transit Auth., No. 17-2007 (CKK), 2019 WL 2120324, at *12 (D.D.C. May 15, 2019) (unreasonable accommodation to take plaintiff out of rotation because would require other

---

[13]     To show that taking him out of the new claims rotation would have been a reasonable accommodation, plaintiff points to a few occasions where defendant took team members out of the rotation.  For example, plaintiff notes that defendant granted his request on March 6, 2014 that he not receive new claims for two weeks.  Such evidence does not create a genuine issue of material fact with regard to the consequences if plaintiff could not perform essential job functions, or how the proposed accommodation would impact other claims adjusters.  The fact that defendant previously took plaintiff out of the claims rotation does not mean that doing so does not burden other team members.  Indeed, in granting the March 6 request, defendant explicitly stressed that handling new claims was an essential function of his job, but that it was granting his request as a good faith gesture.

employees to conduct operations more frequently, giving them less time to complete their own work).

v.    <u>Work Experience</u>

Under factors six and seven, the Court examines the work experience of past employees in plaintiff's position and the current work experience of those currently in similar positions. <u>Adair</u>, 823 F.3d at 1307. Plaintiff's team handled claims for employment practices liability, statute title error and omissions and customer complaint defense. None of defendant's other teams worked these types of claims. Indeed, because none of defendant's other teams could work these types of specialized claims, Miller had to ask one of plaintiff's team members, Palmer, to delay scheduled time off until plaintiff returned from surgery. This factor suggests that receiving new claims is an essential job function.

These factors combine to show that receiving new claims was an essential function of plaintiff's job. Accordingly, as a matter of law, taking plaintiff out of the assignment rotation for new claims was not a reasonable accommodation under the ADA. As a result, the Court grants defendant summary judgment on plaintiff's failure-to-accommodate claims under Count 1.

**III.  Discrimination And Disparate Treatment (Count 2)**

Plaintiff claims that defendant discriminated against him based on disabilities when it terminated his employment. The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To determine whether defendant discriminated against plaintiff in violation of the ADA, the Court applies a burden-shifting analysis. <u>See</u> <u>EEOC. v. C.R. England, Inc.</u>, 644 F.3d 1028, 1038 (10th Cir. 2011). Under this analysis, plaintiff must first

establish a prima facie of discrimination by showing that (1) he is disabled under the ADA,[14] (2) he is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job[15] and (3) defendant discriminated against him because of his disability.  Adair, 823 F.3d at 1304.  Once plaintiff establishes a prima facie case, the burden shifts to defendant "to articulate a legitimate, nondiscriminatory reason for its actions."  C.R. England, Inc., 644 F.3d at 1038.  If defendant does so, the burden shifts back to plaintiff to show that defendant's stated reasons are merely pretextual.  Id. at 1039.

Here, defendant asserts that it is entitled to summary judgment on plaintiff's discrimination claim under Count 2 because (1) plaintiff has not shown that defendant discriminated against him, (2) it had a nondiscriminatory reason for its actions and (3) its reason was not pretextual.

## A.     Discrimination

Defendant asserts that it did not discriminate against plaintiff because he did not suffer an adverse employment action.  To demonstrate discrimination under the ADA, plaintiff must generally show that he suffered an "adverse employment action because of his disability."  Id. at 1038.  While the Tenth Circuit liberally defines "adverse employment action," the term only encompasses acts "that constitute a significant change in employment status."  Id. (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006)).  This includes actions such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Id.  Plaintiff, however, must show that the alleged adverse action caused more than "*de minimus* harm" to or a "*de minimus* impact" on his

---

[14]      For the reasons above, plaintiff's allegations regarding his omental infarction and cancer satisfy the disability requirement for purposes of summary judgment.

[15]      Defendant does not contest that plaintiff is a qualified individual under the ADA.

job opportunities or status.  Id.   Accordingly, although the ADA does not confine the term to "monetary losses in the form of wages or benefits," "a mere inconvenience or an alteration of responsibilities" is insufficient to arise to the level of adverse employment action.  Id.

Here, plaintiff does not clearly identify the adverse employment actions that he suffered. As best the Court can ascertain, he asserts three specific actions that defendant took: (1) the written warning extension on May 8, 2014, (2) plaintiff's 2014 mid-year review and (3) the termination of plaintiff's employment.

### 1.    Written Warning Extension And Mid-Year Review

Plaintiff asserts that defendant took adverse action against him when it extended his written warning period on May 8, 2014 due to his continued unsatisfactory performance, and when Miller told plaintiff that some areas of his performance fell below expectations in his 2014 mid-year review.  Neither the written warning extension nor plaintiff's 2014 mid-year review constitute adverse employment actions because they did not significantly change his employment status.[16] The warning merely extended plaintiff's current status, and the mid-year review only provided plaintiff feedback about his performance, without any type of rating.  Accordingly, neither constitute adverse employment actions.  See Johnson v. PNC Bank, No. 12-2244-CM, 2013 WL 6004164, at *4 (D. Kan. Nov. 13, 2013) (written warning not adverse employment action because no significant change in employment status); see also Paige v. Donovan, No. 09-01811-WJM, 2011 WL 5520298, at *8 (D. Colo. Nov. 14, 2011), aff'd 511 F. App'x 729 (10th Cir. 2013) (mid-

---

[16]    Plaintiff only mentions these actions once, stating that defendant "concedes" that they constitute adverse employment actions.  Plaintiff's Response (Doc. #74) at 110.  Plaintiff apparently did not read defendant's brief closely enough – defendant dedicates an entire page to arguing that these actions do not constitute adverse employment actions under the ADA.  See Defendant's Motion For Summary Judgment (Doc. #67) at 54.

year progress review not adverse employment action because no significant change in employment status).

### 2. Termination Of Employment

Plaintiff's evidence regarding the end of his employment creates a genuine issue of material fact whether defendant fired him. Plaintiff asserts that defendant formally terminated his employment on September 4, 2014 when Ratzloff sent him an email purporting to accept his alleged resignation. The email stated that defendant accepted plaintiff's resignation, and confirmed that his last day of employment was September 2, 2014. Plaintiff responded to this email, clarifying that he was not resigning. By contrast, defendant asserts that plaintiff resigned during phone conversations with Ratzloff on August 27 and 28, 2014, which Ratzloff's email of September 4 memorializes. Viewing the evidence in light most favorable to plaintiff, these allegations create a genuine issue of material fact whether defendant fired plaintiff, which would constitute an adverse employment action.[17] See C.R. England, Inc., 644 F.3d at 1038. Thus, for purposes of summary judgment, plaintiff has established a prima facie case of discrimination under the ADA.

### B. Nondiscriminatory Reasons

Because plaintiff has established a prima facie case of discrimination, the burden shifts to defendant "to articulate a legitimate, nondiscriminatory reason for its actions." Id. Attendance is a legitimate, nondiscriminatory reason under the ADA. See Strauthers v. Kellogg Sales Co., No. 16-2530-CM, 2018 WL 623606, at *5 (D. Kan. Jan. 30, 2018). Here, the only reason that defendant proffers for allegedly firing plaintiff is his attendance shortly before his termination.

---

[17] Plaintiff does not assert that defendant constructively discharged him.

Although defendant does not clearly identify the days on which it considered plaintiff truant, it appears that defendant is asserting that plaintiff wrongfully failed to attend work from Wednesday, August 27, 2014 until his alleged termination.[18]  Defendant's Motion For Summary Judgment (Doc. #67) at 56.

### C.    Pretext

Because defendant came forward with a nondiscriminatory reason for its actions, the burden shifts back to plaintiff to show that defendant's stated reason is merely pretextual.  See C.R. England, Inc., 644 F.3d at 1039.  Under the ADA, plaintiff can establish pretext by showing that defendant's proffered nondiscriminatory explanations for its action are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief."  Johnson v. Weld Cty., Colo., 594 F.3d 1202, 1211 (10th Cir. 2010).

Here, plaintiff argues that defendant's proffered explanation for firing him (poor attendance) is pretextual because, among other reasons, (1) defendant did not have a problem with the two-day absence from work before his termination and (2) defendant had repeatedly solicited plaintiff's resignation long before this absence even began.

The record reveals a genuine issue of material fact whether defendant's proffered reason for firing plaintiff was pretextual.  Specifically, a rational factfinder could conclude that defendant used plaintiff's short absence as an excuse to terminate his employment.  Defendant clearly became frustrated with plaintiff's job performance over the course of his employment, but it does not assert that it terminated his employment for that reason.  Defendant only asserts that it fired plaintiff because he did not attend work from August 27, 2014 until his alleged termination.

---

[18]    Defendant does not assert plaintiff's poor performance history as a nondiscriminatory reason for his discharge.  Accordingly, the Court will limit its analysis to defendant's proffered nondiscriminatory reason: poor attendance.

The uncontested facts show, however, that defendant did not always have a problem with the short absence at issue. Indeed, the absence began at defendant's own request — Ratzloff told plaintiff to go home on August 27, and to take the following day off from work as well. Accordingly, because defendant's final email specifies that plaintiff's last day of employment was September 2, this leaves only two days when plaintiff could have been truant: Friday, August 29, and Tuesday, September 2.[19] In other words, the only reason defendant proffers for plaintiff's termination is this two-day absence. During this short period, however, Ratzloff and plaintiff communicated on several occasions, and plaintiff repeatedly clarified that he was not resigning and just wanted to work for a different supervisor. Although Ratzloff told him that she expected him to return to work, she asked plaintiff to be patient as she handled the situation. Specifically, Ratzloff indicated that she needed more time to evaluate whether plaintiff could report to a different supervisor. Only a few days later, defendant fired plaintiff, asserting his absence as the reason.[20] This evidence suggests that plaintiff's two-day absence was a pretextual reason for his termination.

Moreover, defendant began discussing the end of plaintiff's employment long before this short absence, and many of these discussions occurred around plaintiff's medical time-off. In fact, they began as early as February 17, 2014, the day plaintiff returned to work after his emergency room visit. On that day, Miller told plaintiff that after his 60-day warning period, defendant would offer him a two-month severance or terminate his employment. Similarly, on March 27, 2014, the day that plaintiff informed Miller of his upcoming surgery and working restrictions, plaintiff made

---

[19]     August 30, 2014 was a Saturday, and August 31 was a Sunday. Moreover, September 1 was Labor Day.

[20]     The record does not contain any evidence regarding defendant's policy on unexcused absences.

notes from a meeting in which Miller discussed his resignation. On August 11, 2014, the day

plaintiff returned from surgery, Miller again told plaintiff that he was waiting to hear from human

resources about a separation agreement. Similarly, although they do not identify the exact date,

Ratzloff's notes from her conversation with plaintiff on August 27, 2014 (the day that plaintiff's

allegedly problematic absence began) indicate that she had already solicited a mutual resignation

agreement from him. A rational factfinder could conclude that these continuous discussions about

ending plaintiff's employment, particularly those made near his medical time-off, show that the

short absence before his termination was pretext for discriminating on the basis of disability.

Accordingly, the Court denies defendant summary judgment on plaintiff's discrimination and

disparate treatment claims under Count 2.

## IV. Hostile Work Environment (Count 2)

Plaintiff claims that defendant created a hostile work environment in violation of the ADA.

To establish a hostile work environment claim under the ADA, plaintiff must show that a rational

jury could find that "the workplace [was] permeated with discriminatory intimidation, ridicule,

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment." Williams v. FedEx Corp. Servs., 849 F.3d 889, 897

(10th Cir. 2017). To determine whether plaintiff has made this showing, the Court "look[s] to all

the circumstances, including the frequency of the discriminatory conduct; its severity; whether it

is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." Id. Accordingly, a "few isolated incidents of

remarks expressing hostility toward individuals with disabilities will not suffice." White v.

CertainTeed Corp., No. 17-2262-DDC, 2019 WL 2085671, at *12 (D. Kan. May 13, 2019).

Instead, "there must be a steady barrage of opprobrious [disability-based] comments." Id.

Here, plaintiff does not clearly elaborate on his hostile work environment claims. His allegations appear to center on Miller's criticism of his job performance, arguing that Miller "harassed [him] about his performance on a regular basis," and that "Miller refused to acknowledge [his] workload and honor his work restrictions." Plaintiff's Response (Doc. #74) at 111.[21] Plaintiff makes no other argument other than concluding that he "has detailed the behavior [in other portions of his brief] that makes up his hostile work environment claim."[22] Id.

It is not the Court's responsibility to comb through plaintiff's pleadings to craft a hostile work environment claim for him. Even so, plaintiff's allegations are insufficient to establish such a claim under the ADA. Plaintiff has not shown that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult" to the point that it created an "abusive working environment." Williams, 849 F.3d at 897. Miller's criticisms of his job performance are insufficient to create a genuine issue of material fact in this regard. Peru v. T-Mobile USA, Inc., 897 F. Supp. 2d 1078, 1094 (D. Colo. 2012) (recognizing that "even loud expressions of disapproval" fall within "the kind of normal strains that can occur in any office setting"). Accordingly, the Court grants defendant summary judgment on plaintiff's hostile work environment claim under Count 2.

---

[21]     Plaintiff also alleges that Miller "shouted at [him] shortly before taking leave for surgery." Plaintiff's Response (Doc. #74) at 86, 111. Plaintiff, however, does not assert this fact in numbered paragraphs to allow defendant to dispute it. Even if he had, however, the evidence that plaintiff cites does not support the proposition for which he offers it – it states only that "[t]here was *almost* a shouting match" between Miller and plaintiff. Id. at 86 (emphasis added).

[22]     Defendant offers the internal accusations that plaintiff made to Atkinson as plaintiff's potential hostile work environment allegations. See Defendant's Motion For Summary Judgment (Doc. #67) at 59. Yet, although the parties do not dispute that plaintiff made these accusations to Atkinson, the content of these accusations do not appear to be undisputed, and plaintiff makes no argument to the contrary. Accordingly, the Court does not use them for purposes of summary judgment.

## V.     Retaliation (Count 3)

Plaintiff claims that defendant retaliated against him in violation of the ADA by terminating his employment because he reported Miller's inappropriate comments and sought reasonable accommodations for his disabilities.  Under the ADA, "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  White, 2019 WL 2085671, at *13 (quoting 42 U.S.C. § 12203(a)).  To establish a prima facie case of retaliation under the ADA, plaintiff must show that (1) he engaged in a protected activity, (2) he "was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity"[23] and (3) "there was a causal connection between the protected activity and the adverse employment action."  Foster v. Mountain Coal Co., LLC, 830 F.3d 1178, 1187 (10th Cir. 2016).  Here, defendant asserts that it is entitled to summary judgment on Count 3 because plaintiff's protected activities did not cause his alleged termination.

### A.     Protected Activities

For purposes of his retaliation claim, plaintiff alleges that he engaged in protected activities by reporting Miller's inappropriate comments to Atkinson and seeking reasonable accommodations.  Defendant does not dispute that the ADA protects these activities.  Under the ADA, when plaintiff alleges an accommodation request as a protected activity, he must show that (1) he made an adequate request that is "sufficiently direct and specific, giving notice that [the

---

[23]      As addressed above, plaintiff's only viable adverse employment action is his termination.  In his response to defendant's motion, plaintiff for the first time alleges that defendant retaliated against him by opposing his request for unemployment benefits.  Plaintiff's Response (Doc. #74) at 109.  Plaintiff did not allege this retaliatory act in his complaint, and it is not included in the Pretrial Order (Doc. #63).  Accordingly, the Court disregards this allegation.

employee] needs a special accommodation," and (2) he had a "reasonable, good faith belief that he was entitled to an accommodation when he made the request." Id.

Here, although he does not elaborate on the specific accommodation requests for which defendant retaliated, the Court assumes that plaintiff refers to those that he invoked for his failure-to-accommodate claim. Those include: (1) in late 2013, a request for a new chair; (2) on February 8, 2014, a request to take a week off from work; (3) on February 17, 2014, a request that defendant remove him from the new claims rotation for two weeks; (4) on February 18, 2014, a request that defendant remove him from the new claims rotation for two weeks (later amended to three weeks); (5) on March 10, 2014, a request to work no more than eight hours a day and 40 hours a week; (6) on March 27, 2014, a request to work no more than eight hours a day and 40 hours a week; (7) on March 27, 2014, a request for time off for kidney surgery on May 27 and recovery, which ultimately amounted to approximately two months; (8) on August 11, 2014, a request that defendant temporarily remove him from the new claims rotation; (9) in late August of 2014, multiple requests for a different manager; (10) "time off for medical appointments" and (11) "redistribution of caseloads." Plaintiff's Response (Doc. #74) at 93-94.

Here, all but two of plaintiff's accommodation requests constitute protected activities under the ADA. For each of the first nine Requests, plaintiff adequately put defendant on notice that he needed the particular accommodations by asking for them,[24] and defendant has presented no

---

[24]    With respect to Request 8, the undisputed facts do not show that on August 11, 2014, plaintiff explicitly asked Miller to remove him from the new claims rotation. Plaintiff was not receiving new claims at the time, and he merely asked Miller how long that would last. Nonetheless, viewing it in light most favorable to plaintiff, the evidence creates a genuine issue of material fact whether this put defendant on notice that he needed the accommodation. See Foster, 830 F.3d at 1188 (plaintiff need not use "magic words," but only make clear that he "wants assistance" for his disability).

evidence that plaintiff lacked a reasonable, good-faith belief that he was entitled to the accommodations.

For Requests 10 and 11, however, the evidence does not show that plaintiff put defendant on adequate notice that he needed the specific accommodations. In Request 10, plaintiff vaguely states that he requested "time off for medical appointments." He does not describe specific requests to which he is referring, nor does he provide the dates of these requests. Accordingly, the evidence does not show that he gave defendant notice that he generally needed more "time off for medical appointments." Likewise, for Request 11, the record does not contain any evidence that plaintiff ever requested a "redistribution of caseloads" to adequately put defendant on notice that he needed such an accommodation. Accordingly, the Court grants defendant summary judgment with respect to Requests 10 and 11.

### B.    Causation (Requests 1-9)

Defendant argues that plaintiff's participation in these ADA-protected activities did not cause his alleged termination. Under the ADA, plaintiff must establish "a causal connection" between his protected accommodations and his termination. Foster, 830 F.3d at 1187. To do so, plaintiff must present "evidence of circumstances that justify an inference of retaliatory motive." Ward v. Jewell, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1091 (10th Cir. 2007)). If the termination closely followed the protected activity, "courts have often inferred a causal connection." Id. If the termination did not closely follow the protected activity, however, plaintiff must use "additional evidence" to establish causation. Id.; Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (three-moth period between protected conduct and adverse action too long for factfinder to infer causation). The Supreme Court "has likened this burden to showing a 'but-for causation.'" Ward, 772 F.3d

at 1203 (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013)). The evidence

of but-for causation "must be based on more than mere speculation, conjecture, or surmise." Id.

(quoting Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004)).

Here, plaintiff cannot establish a causal connection between his termination and his request

in late 2013 for a new chair (Request 1). Defendant allegedly fired plaintiff in September of 2014.

Although it is unclear in which month of 2013 plaintiff requested the chair, this is far too long to

infer a causal connection. See Anderson, 181 F.3d at 1179. Moreover, plaintiff has presented no

additional evidence to show that this request caused his termination. Accordingly, this request is

insufficient to support a retaliation claim under the ADA.

Plaintiff's remaining requests are sufficient, however, to establish causation for purposes

of summary judgment. This includes his requests on February 8 and March 27, 2014 to take time

off from work (Requests 2 and 7), his requests on March 10 and March 27, 2014 to work no more

than eight hours a day and 40 hours a week (Requests 5 and 6), his requests on February 17,

February 18 and August 11, 2014 to not receive new claims (Requests 3, 4 and 8) and his requests

in late August 2014 for a different manager (Request 9).

Plaintiff's termination occurred shortly after his requests in August to not receive new

claims and to receive a different manager (Requests 8 and 9). Accordingly, the record supports an

inference of causation for these ADA-protected activities. Moreover, although the other requests

occurred too long before termination to infer causation, the undisputed facts offer the additional

evidence necessary to create a genuine issue of material fact whether these accommodations

caused his termination. Viewed in the light most favorable to plaintiff, the evidence shows that

defendant began discussing the end of plaintiff's employment around the time he started seeking

these accommodations. As he continued to make further requests, these discussions progressed

until defendant allegedly fired him. Defendant's comments about ending plaintiff's employment began as early as February 17, 2014 – the day he returned to work after his week off (Request 2) and asked not to receive new claims (Request 3). On that day, Miller told plaintiff that after his 60-day warning period, defendant would offer him a two-month severance or terminate his employment. Similarly, on March 27, 2014, the day that plaintiff informed Miller of his upcoming surgery and working restrictions (Requests 6 and 7), plaintiff made notes from a meeting in which Miller discussed resignation. On August 11, 2014, that day that plaintiff returned from surgery and asked not to receive new claims (Request 8), Miller again told plaintiff that he was waiting to hear from human resources about a separation agreement. These continuous discussions about ending plaintiff's employment, particularly when made around his requested accommodations, create a genuine issue of material fact whether the requests caused his termination. Accordingly, the Court denies defendant summary judgment on plaintiff's retaliation claims under Count 3.

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #66) filed August 9, 2019 is **SUSTAINED in part**. The Court grants defendant summary judgment on plaintiff's failure-to-accommodate claims under Count 1 and his hostile work environment claim under Count 2. The Court, however, denies defendant summary judgment on plaintiff's discrimination and disparate treatment claims under Count 2 and his retaliation claims under Count 3.

Dated this 13th day of November, 2019 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge